UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| MICHAEL CLARK, et al. | ) |
| | ) |
| PLAINTIFF | ) |
| | ) |
| v. | ) CIVIL ACTION NO.:04CV-735-H |
| | ) |
| | ) |
| BELLSOUTH TELECOMMUNICATIONS, INC. | ) (Electronically Filed) |
| | ) |
| DEFENDANT | ) |

**MEMORANDUM IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF COSTS**

Plaintiffs and class representatives Michael Clark and Kentucky Air Tool, Inc., individually and on behalf of all other class members, for their Memorandum in Support of Motion for Attorneys' Fees and Reimbursement of Costs, state as follows:

**INTRODUCTION AND BACKGROUND**

After more than three years of concerted effort and more than two years after filing this lawsuit, the Plaintiffs in this action have succeeded in obtaining complete relief for the more than fifty thousand class members in Kentucky who were overcharged during a six year period. If the Stipulation of Settlement Agreement and Release filed in this case on May 16, 2007 (the "Settlement Agreement") [#92] is approved by the Court, the classes will receive one hundred percent of their money back, plus interest at the statutory rate prescribed by KRS § 131.183. This multi-million dollar recovery is due to the persistent efforts of Plaintiffs and their counsel. Consequently, Plaintiffs are entitled to reimbursement of costs and to reasonable attorneys' fees pursuant to the Common Fund Doctrine established over a century ago by the United States Supreme Court and

codified in Kentucky law at KRS 412.070(1). *See* Affidavit of Gregory A. Belzley, attached hereto as Exhibit 1; Response of Plaintiffs to the Court's Memorandum Opinion and Order filed December 1, 2006 [#76] (ordering Plaintiffs' to advise the Court on their theory for attorneys' fees) (the "December 1 Response").

As Plaintiffs more fully set forth in their December 1 Response, under the Common Fund Doctrine, it is not necessary for Plaintiffs to have won – or even to have commenced – a lawsuit in order to obtain attorneys' fees, as long as the Plaintiffs' efforts constitute a "substantial cause of the benefit obtained" by the class members. *Savoie v. Merchants Bank,* 84 F.3d 52, 56 (2d Cir. 1996). "Fees may be awarded even when there is no judgment on the merits or when the dispute has become moot because the relief sought is otherwise obtained." *Id.* (Internal citations omitted).

Here, the Kentucky Board of Tax Appeals entered, on April 5, 2007, Order No. K-19805 (the "Agreed Judgment")[Attachment 1 to Settlement Agreement] as submitted by BellSouth and the Kentucky Department of Revenue and as approved by Plaintiffs. The Agreed Judgment provides for a fund to return all sales taxes improperly assessed upon, and paid by, the classes represented by Plaintiffs. Plaintiffs' vigorous pursuit of their legal rights through this lawsuit, and advocacy before the Board of Tax Appeals constitutes a "substantial cause of the benefit," *Savoie*, 84 F.3d at 56, that will be obtained by the members of the Plaintiff classes. Indeed, Plaintiffs' efforts are *the* cause of that imminent benefit, as the history of this case clearly shows.

Prior to Plaintiffs' filing of this case, BellSouth refused even to entertain the notion that its assessment of Kentucky sales tax on Internet access services was unlawful.

When the named Plaintiffs filed claims for repayment with BellSouth, BellSouth rejected or ignored the claims. Plaintiffs then filed their Complaint on November 23, 2004.

BellSouth continued its adamant refusal to recognize Plaintiffs' claims. On December 1, 2004, BellSouth's General Counsel sent a letter to Plaintiffs' counsel [Attached as Exhibit C to Plaintiffs' December 1 Response] advising Plaintiffs' counsel to dismiss the case and admonishing the Plaintiffs that, "[h]ad a reasonable inquiry been made prior to [the lawsuit's] filing, you would have no doubt concluded this lawsuit is neither well grounded nor warranted by existing law." Despite BellSouth's subtle use of language indirectly implicating Fed. R. Civ. P. 11, Plaintiffs refused to dismiss.

On December 28, 2004, BellSouth filed its Answer, once again denying (among other things) Plaintiffs' assertion that BellSouth's Internet access service was not subject to sales tax. [BellSouth Answer [#3], ¶ 18 ("BellSouth denies the allegation that its DSL Internet Access Service '[is] not subject to the Kentucky sales tax.'")].

The history of this case shows indisputably that at the time this lawsuit commenced, and for some time afterward, BellSouth had no intention of taking even the first step to end the collection of the unlawful "tax." Had Plaintiffs accepted BellSouth's admonitions, no Class member would have any chance of receiving any refund whatsoever.

Then, on January 4, 2005, two months after Plaintiffs filed their Complaint, BellSouth filed a Sales and Use Tax Refund Application with the Kentucky Department of Revenue ("BellSouth Refund Application"), containing a statement entitled "Reasons for Refund." BellSouth's "Reasons for Refund" were, in its own words, as follows:

> A putative class action suit was recently filed against BellSouth …. In their Complaint, a copy of which is attached as Exhibit A, the plaintiffs

3

> have alleged that BellSouth incorrectly collected and remitted Kentucky sales tax with respect to certain of its Internet services…. Among other things, the plaintiffs are seeking from BellSouth a refund of all Kentucky sales tax paid by customers with respect to Internet access services. Although Bellsouth [sic] ***intends to defend this suit vigorously***, it is possible that the courts will disagree …. ***This refund claim is filed in order for BellSouth to recover from the Department any sales taxes that it may be required to refund to its customers <u>as a result of this suit</u>***.

[BellSouth Refund Application, Attachment 2, Exhibit A to Plaintiffs' December 1 Response](Emphasis added).

It is unnecessary to apprise this Court once again of the procedural wrangling which has taken place in this Court during the period in which BellSouth's refund application has wended its way through the administrative process. Numerous motions, responses, and memoranda have been filed while Plaintiffs sought to obtain class certification and opposed BellSouth's repeated motions for dismissal. Well over two years after the filing of this lawsuit, with this case still proceeding, the Kentucky Department of Revenue, BellSouth, and the Kentucky Board of Tax Appeals finally acknowledged that the alleged sales taxes were unlawfully collected and agreed that 100% of those alleged taxes must be, and will be, repaid to the members of the Plaintiff classes with interest.

But for the Plaintiffs and their attorneys, there would have been no Agreed Judgment presented to, or entered by, the Board of Tax Appeals, and no repayment for anyone. Plaintiffs' motion for attorneys' fees and reimbursement of costs is reasonable and should be granted.

**ARGUMENT**

I.      PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES UNDER THE COMMON FUND DOCTRINE.

Plaintiffs are entitled to attorneys' fees from the common fund that exists as a result of their efforts.

The facts are clear. BellSouth never would have decided on its own that its customers should receive a repayment of the alleged sales taxes, and the Board of Tax Appeals never would have entered an Order approving a repayment, had Plaintiffs not filed this suit. When BellSouth finally requested the refund that, if granted, must be used to provide a multimillion dollar recovery for the Plaintiff Classes, it did so explicitly as a result of Plaintiffs having filed this suit. Finally, the Agreed Judgment entered by the Board of Tax Appeals specifically provides for attorneys' fees as ordered by this Court, thereby obviating any concern that such an order encroaches upon the prerogatives of the Board of Tax Appeals.

The United States Supreme Court has repeatedly explained that the courts' inherent and "historic equity jurisdiction" is the source of the Common Fund Doctrine, by which courts may award "attorneys' fees to a party whose litigation efforts benefit others." *Chambers v. NASCO, Inc.* 501 U.S. 32, 45 (1991). In addition, in Kentucky, the entitlement to attorneys' fees from the common fund is a matter of statute:

> In actions for … the recovery of money or property which has been illegally or improperly collected, withheld or converted, if one (1) or more of the …distributees or parties in interest has prosecuted for the benefit of others interested with him, and has been to trouble and expense in that connection, the court shall allow him his necessary expenses, and his attorney reasonable compensation for his services, in addition to the costs. This allowance shall be paid out of the funds recovered before distribution….

5

KRS 412.070(1).

Kentucky's statute reflects over one hundred years of equity jurisprudence in both state and federal courts pursuant to which "an attorney who renders services in recovering a fund in which numerous parties are interested, is entitled to a fee out of the fund." *King v. City of Covington,* 298 Ky. 695, 160 S.W.2d 13, 14 (Ky. 1942). As Kentucky's highest court has declared, it is simply "unfair" to permit an interested party to benefit from creation of the fund and yet allow someone else to "bear all the costs and expense of the litigation." *Howell v. Highland Cemetery Co.,* 297 Ky. 659, 181 S.W.2d 44, 45 (Ky. 1944). *See also Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 127 (1885) (recognizing a lien on property recovered by the plaintiffs on behalf of themselves and others similarly situated, "upon every ground of justice," since all who would benefit "accepted the fruits of the labors of complainants and their solicitors").

The "leading 'equitable fund' case", *Sprague v. Ticonic National Bank,* 307 U.S. 161 (1939), reaffirmed the principle that equity will ensure recompense for efforts expended for the benefit of others. *In re Air Crash Disaster at Florida Everglades on December 29, 1972,* 549 F.2d 1006, 1011 (5th Cir. 1977). *Sprague* involved litigation by a single plaintiff that had resulted, by means of *stare decisis,* in a legal decision that would benefit fourteen other similarly situated bondholders. The Supreme Court brushed aside the technical arguments advanced against the Plaintiff's claim to attorneys' fees, finding it irrelevant that the Plaintiff had not sued on behalf of a class and had not "formally established by litigation a fund available to the class." Instead of focusing on formalities, the Court went straight to the heart of the matter:

> … when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation …hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation.

*Id.* at 167.

Here, as in *Sprague,* the efforts of Plaintiffs and their counsel created a fund for the benefit of others.

Much more recently, the court in *Wheeless v. Gelzer,* 765 F.Supp.741, 743 (N.D. Ga. 1991) quoted *Sprague,* 307 U.S. at 166, in explaining that "[C]ourts of equity have long been empowered to provide monetary awards that are restitutionary in nature," and that "'the foundation for the historic practice of granting reimbursement for the costs of litigation…is part of the original authority of the chancellor to do equity in a particular situation.'" *See also Trustees v. Greenough,* 105 U.S. 527, 532 (1881) (holding that denial of plaintiff's attorneys' fees from the common fund "would not only be unjust to him, but it would give to the other parties entitled to participate in the benefits of the fund an unfair advantage. He has worked for them as well as for himself…"); *Flynn v. State Compensation Insurance Fund,* 312 Mont. 410, 60 P.3d 379 (2002) (enforcing the Common Fund Doctrine by requiring the State Compensation Insurance Fund to pay a share of Plaintiff's counsel fees incurred in recovering social security benefits that entitled the Fund to reduce compensation payments it would otherwise have made, because the Fund "was not required to intervene, risk expense, or hire an attorney," yet "reaped the benefit of Flynn's efforts," *id.* at 401); *Hall v. Cole,* 412 U.S. 1, 14 (1973) (requiring union to pay plaintiff's attorneys' fees because plaintiff had conferred a benefit on all members of the union by protecting their interests in free speech based not only on statute but on the "historic equitable power of federal courts to grant such relief in the

interests of justice"); *York Insurance Group of Maine v. Van Hall,* 704 A.2d 366 (Me. 1997) (a subrogation clause entitling insurer to repayment of *all* funds expended by it if insured recovered from tortfeasor did not defeat the Common Fund doctrine; insurer was required to pay proportionate share of the insured's attorneys' fees incurred in providing common benefit to both insured and insurer).

The Sixth Circuit Court of Appeals has held that, when an application for attorneys' fees is filed, the court's purpose is to "make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Rawlings v. Prudential Bache Properties, Inc.,* 9 F.3d 513, 516 (6th Cir. 1993), *citing Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 166-68 (3rd Cir. 1973). In *Lindy Bros.*, after remand and a second appeal, the Third Circuit Court of Appeals discussed in detail the principles underlying the Common Fund Doctrine in the context of an objection to payment of attorneys' fees to a law firm that had provided assistance in the litigation but had not served as counsel to the court-appointed class representative. *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3rd Cir. 1976). The proper question, the court observed, was whether the party seeking attorneys' fees rendered "specific services [that] benefited the fund whether they tended to create, increase, protect or preserve the fund." *Id.* at 112.

The court explained that "[f]ederal courts have long recognized 'the historic power of equity to permit … a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit.'" *Id.* at 110,

*quoting Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 257 (1975) (collecting authorities). The doctrine is "analogous to an action in quantum meruit," as the individual seeking compensation has benefited others. *Id.* Either the party or his attorney has a "cause of action" to obtain recompense for the benefit bestowed upon others. *Id.*

The United States Supreme Court in *Sprague* also laid to rest any objection to a recovery of attorneys' fees from a fund that may have been created by another administrative body. As the court in *Morris B. Chapman & Associates, LTD. V. Kitzman,* 193 Ill.2d 560, 574-75 (2000), explained,

> The plaintiff in *Sprague* did not bring a fund into court in which others could participate. The fund, however, existed and was identifiable. It consisted of earmarked bonds in the trust department of a bank in receivership.

Accordingly, the court in *Morris B. Chapman* soundly rejected the defendants' contention that, because the common fund had been created in a Missouri court, and the disposition of that fund had already been ordered by the Missouri court, an Illinois court could not order payment of attorneys' fees from that fund. *Id.* at 1274. *See also In re Air Crash,* 549 F.2d at 1018 (finding that a common fund in the hands of the court is "not a necessity" and citing examples of funds from which attorneys' fees can be paid, including "potential rebates segregated on the books of a utility").

Moreover, in this case, the Agreed Judgment specifically defers to this Court on the issue of attorneys' fees, incorporating into the decision a provision for attorneys' fees from the common fund in an amount to be awarded by this Court [Agreed Judgment at 5].

Finally, Plaintiffs were the drivers of all of the proceedings associated with the recovery and creation of the common fund in this case. In *Thomas v Honeybrook Mines, Inc.,* 428 F.2d 981 (3rd Cir. 1970), *cert. denied,* 401 U.S. 911 (1971), the Third Circuit was quick to reverse a district court that had refused attorneys' fees to a miners' group that had spurred litigation that resulted in creation of a common fund. The lower court erroneously had concluded that the key issue was whether recovery had been achieved in cases wherein the miners' group had been the plaintiff, and found that the trustees of the fund in which the miners were interested, rather than the miners' group itself, had been "the actual plaintiffs" in the suits resulting in recovery. The Third Circuit found that the District Court's holding reflected "a far too narrow view of the applicable rule":

> We hold that committee activities forced the Fund trustees to commence the delinquency lawsuits, that these lawsuits produced the fund and that the committee's counsel fees and expenses incurred in bringing about the delinquency lawsuits are properly payable out of the Fund.

*Id.* at 985.

Like the miners' group in *Honeybrook Mines,* Plaintiffs in this case forced the issue, caused the creation of the common fund, and pursuant to well-established judicial precedent, as well as KRS 421.070(1), are entitled to an award of attorneys' fees from the common fund.

II. HERE, AS IN OTHER COMMON FUND CASES, REASONABLE ATTORNEYS' FEES SHOULD BE CALCULATED BY THE PERCENTAGE OF THE FUND METHOD RATHER THAN THE LODESTAR METHOD.

The United States Supreme Court consistently has held for well over a century that the percentage of the fund method is the proper method to calculate reasonable

10

attorneys' fees in a common fund case. *See, e.g., Pettus; Sprague; Blum v. Stenson,* 465 U.S. 886, 900, n. 16 (1984) ("under the 'common fund doctrine'… a reasonable fee is based upon a percentage of the fund bestowed on the class"). When determining a reasonable fee, "the most critical factor is the degree of success obtained," *Hensley v. Eckert,* 461 U.S. 424, 436 (1983), and, as the Sixth Circuit Court of Appeals explained in *Rawlings,* 9 F.3d at 516, it is not the lodestar method, but "the percentage of the fund method [that] more accurately reflects the results achieved."

Despite the Supreme Court's decades-long consistency with regard to awarding attorneys' fees in common fund cases by the percentage method, a few federal courts have, over the past thirty years, used in some cases an alternative method known as "lodestar/multiplier," wherein attorney fees were calculated by hours expended (valued and counted by shifting methods), coupled with numerous other discretionary factors which were translated from abstractions to mathematical values resulting in a "multiplier." *See, e.g., Lindy Bros.,* 487 F.2d at 167-169 (3d Cir. 1973). However, the "lodestar/multiplier" vogue for common fund cases was short-lived, even in the Third Circuit, which briefly espoused it. Shortly after the *Lindy Bros.* decision, the Third Circuit convened a task force, whose report is set forth at 108 F.R.D. 237 (1985), concluding that, while lodestar is appropriate in statutory fee-shifting cases, it creates serious problems in common fund cases, in which percentage of the fund is a superior method of calculating fees. *Id.* at 254 -59. *See also Blum,* 465 U.S. at 900, n. 16 (expressly distinguishing attorneys' fee calculation in fee-shifting cases, wherein lodestar is proper, from the fee calculations in common fund cases, wherein the percentage method is proper).

Since then, as the court in *Howes v. Atkins,* 668 F.Supp. 1021, 1024 (E.D. Ky. 1987) recognized, "There has been a trend away from the lodestar approach and back to a percentage award in common fund cases." The Eleventh Circuit Court of Appeals even has required the percentage method rather than the lodestar method in common fund cases. *See Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991) ("…the percentage of the fund approach is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based on a reasonable percentage of the fund established for the benefit of the class. The lodestar analysis shall continue to be the applicable method used for determining statutory fee-shifting awards"). In its analysis, the Eleventh Circuit Court of Appeals emphasized that, despite the temporary vogue enjoyed by the lodestar approach, the United States Supreme Court had never adopted the method: "Indeed, every Supreme Court case addressing the computation of a common fee award has determined such fees on a percentage of the fund basis." *Id.* at 773.

The *Dunkle* court discussed the Third Circuit Task Force at some length, particularly its conclusion that the lodestar/multiplier approach "failed to achieve any … stated goals in common fund cases in which the measure of the recovery is the best determinant of the reasonableness of the time expended." *Id.* at 774. The court also quoted H. Newberg, *Attorney Fee Awards* § 2.07, at 47 (1986) in comparing attorneys' fees calculations in common fund cases to those in fee-shifting cases:

> …[I]n contrast to the calculation of a statutory fee, 'payable by the defendant depending on the extent of success achieved, a common fund is itself the measure of success… [and] represents the benchmark on which a reasonable fee will be awarded." … In this context, monetary results achieved predominate over all other criteria. *Id.,* § 206 at 41.

The D.C. Circuit also unequivocally supports the percentage method over the lodestar in common fund cases, noting the United States Supreme Court's endorsement of the percentage method for common fund cases in *Blum* and declaring that the percentage method is "more efficient, easier to administer, and more closely reflects the marketplace." *Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1270 (D.C. Cir. 1993).

Considerably more blunt in its disapproval of the use of lodestar in common fund cases was the court in *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 724 F.Supp.160, 170 (S.D.N.Y. 1989), remarking that "largely judgmental and time-wasting computations of lodestars and multiplers …. no matter how conscientious, often seem to take on the character of so much Mumbo Jumbo. They do not guarantee a more fair result or a more expeditious disposition of litigation."

As the court in *In re First Fidelity Bancorp. Securities Litigation,* 750 F.Supp. 160, 164 (D.N.J. 1990) noted, the percentage of the fund method is preferable not only because it more accurately reflects the actual benefits achieved by the attorneys; it is also more acceptable to the public at large. An attorneys' fee award based on a percentage of what they obtained, the court declared, not only reflects "market practices and expectations;" it is more likely to inspire public confidence than will a "fee [that] is based upon hours spent and customary charges, multiplied by an arbitrary figure…. [T]he public should readily accept a fee which is proportional to the benefit derived and conferred, although not directly to the time devoted." *Id.*

Additional policy reasons for preferring the percentage method over the lodestar method were set forth in the following cases: *Howes,* 668 F.Supp. at 1025: "Percentage awards in common fund cases recognize the economics of litigation practice," while use

of the lodestar method "encourages unjustified proliferation of hours or 'churning' by counsel." *Id.* at 1026; *Shalala,* 1 F.3d at 1270: noting that the detailed involvement by the district court in performing the necessary review under the lodestar method, particularly given the heavy workload of most judges, "often results in a substantial delay in distribution of the common fund to the class;" and *Rawlings,* 9 F.3d at 513: use of lodestar "has been criticized for being too time-consuming of scarce judicial resources….District courts must pore over time sheets, arrive at a reasonable hourly rate, and consider numerous factors in deciding whether to award a multiplier….[I]t [the lodestar method] also provides incentives for overbilling and the avoidance of early settlement."

The percentage of the fund method is the proper method for the calculation of attorneys' fees in a common fund case. Its use is appropriate here.


III.  THE COMMON FUND CALCULATION

The United States Supreme Court held in *Boeing Co. v. Van Gemert,* 444 U.S. 472, 480 (1980), that it is necessary in a common fund case to compute the attorneys' fee as a percentage of the *entire fund made available to the class*, rather than as a percentage of claims actually made:

> To claim their logically ascertainable shares of the judgment fund, absentee class members need prove only their membership in the injured class. Their right to share the harvest of the lawsuit … whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel. Unless absentees contribute to the payment of attorney's fees incurred on their behalves, they will pay nothing for the creation of the fund …

14

The percentage method is more easily and quickly administered, conserves judicial resources, reflects accurately the results obtained, is more reasonable in the view of the public, ensures earlier distribution to the class members, and is the preferred choice of courts in the United States in common fund cases. It is, moreover, the only method for establishing attorneys' fees in common fund cases that has been adopted by the United States Supreme Court. Plaintiffs' attorneys' fees should be computed based on the percentage method and the total amount of the award should be based upon the fund made available to the classes.

IV. ATTORNEYS' FEES IN THIS CASE SHOULD BE SET PURSUANT TO THE REPRESENTATIVE PLAINTIFFS' AGREEMENT WITH PLAINTIFFS' ATTORNEYS, WHICH CORRESPONDS TO THE COMMONLY ACCEPTED CONTINGENCY ARRANGEMENT WITHIN THE LEGAL PROFESSION.

A percentage fee that approximates the "market" for legal fees for such cases is the proper goal in setting attorneys' fees. *See, e.g., In re Continental III Sec. Litig.,* 962 F.2d 566, 572 (7th Cir. 1992) ("The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client"). Further, "When the prevailing method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'" *Kirchoff v. Flynn,* 786 F.2d 320, 324 (7th Cir. 1986) (emphasis in original). In Kentucky thirty-three percent is a standard contingent fee. *King v. Grecco,* 111 S.W.3d 877, 883 (Ky. App. 2002) (a "one-third contingency is a commonly accepted arrangement within the legal profession"). Accordingly, the thirty-three percent initially set by the class representatives and their counsel is an appropriate market rate for contingency cases in Kentucky, and is the rate that should be approved by this Court.

15

The percentage is reasonable, both in comparison to the commonly-accepted one-third contingency fee and in comparison to percentages awarded in other cases. The District Court for the Eastern District of Kentucky in *Howes* awarded 40% of the fund. Similarly, this Court, in *In re: ARM Financial Group, Inc. Securities Litigation,* 2006 WL 2570339 (W.D. Ky. 2006) awarded 40% in fees and in reimbursement of expenses, including reimbursement of the representative plaintiff. *See also In re Pacific Enterprises Securities Litigation,* 47 F.3d 373 (9th Cir. 1995) (affirming 33% attorneys' fee of $12 million dollar fund); *In re Relafen Antitrust Litigation,* 231 F.R.D. 52 (D. Mass. 2005) (awarding 33 1/3% of $67 million fund and noting, *id.* at 81, n. 22, that one-third is the benchmark for privately-negotiated contingent fees and that "[c]lass actions are …by their nature more complex than individual actions"); *In re Corel Corp. Inc. Securities Litigation,* 293 F. Supp. 2d 484 (E.D. Pa. 2003) (awarding 33 1/3% of $7 million common fund); *In re Greenwich Pharm Securities Litigation,* 1995 WL 251293 (E.D. Pa. 1995) (approving a 33% fee on a settlement of $4.375 million).

Moreover, an award of 33% in this case is also in accord with those well-reasoned decisions that endorse a higher percentage for similar funds to the one here, but apply a sliding scale to much larger funds, with the percentage decreasing as the total fund significantly increases so as to avoid extraordinary windfall fees. The court in *Greenwich Pharm Securities Litigation* approved a 33% fee as appropriate and stated that "a fee award of 33 percent does not present the danger of providing plaintiffs' counsel with the windfall that would accompany a 'megafund' of, for example, $100 million"). *See also In re Chambers Development Securities Litigation,* 912 F.Supp.852, 860-61 (W.D. Pa. 1995) (in addition to approving reimbursement of expenses, applying a sliding scale to

fee request when a $95 million common fund was obtained in settlement, beginning with thirty percent of the first $10 million, for an aggregate percentage of 21.6 percent of the entire $95 million, and declaring that the declining fee scale for very large funds is the "most efficient, fair, and reasonable method"); *Sala v. Nat'l Railroad Passenger Corp.,* 128 F.R.D. 210 (E.D. Pa. 1989) (33% of first million and 30% of remainder).

There are numerous factors in addition to the size of the fund that a court may weigh while reaching a determination as to the reasonableness of a particular percentage under the circumstances before it. However, numerous courts have indicated that it is counterproductive to overemphasize the "duration of the litigation" or the "amount of time" spent by counsel. "Courts and legal commentators sensibly have rejected the view that early settlement necessarily should reduce the amount of the fee award." *Smithkline Beckman Corp. Securities Litigation,* 751 F.Supp. 525 (E.D. Pa. 1990) (collecting authorities). As the court in *Sala,* 128 F.R.D. at 215 (internal citation omitted), put it, it would "be the height of folly to penalize an efficient attorney for settling a case on the ground that less total hours were expended in the litigation." Indeed, courts prefer the common fund over the lodestar method in part because, under lodestar, there is a disincentive to settle cases when continuing the litigation will increase hours billed. *Relafen,* 231 F.R.D. at 78-79. It would make little sense to negate this key advantage of the percentage method by allowing lodestar to haunt the process by giving undue importance to hours billed or procedures instituted.

The case at bar is almost three years old. A plethora of complex pleadings, procedural gymnastics, and protracted settlement negotiations have marked this case. Moreover, the issues presented by this case have been complex. Sophisticated expertise

17

in the areas of state and federal tax law and in rapidly developing federal Internet and telecommunications law, as defined and regulated by federal and state statutes, federal and state courts, and federal and state regulatory agencies, was required in this case. In addition, it was necessary that Plaintiffs' attorneys bring to bear their working knowledge of Internet technology and telecommunications network topologies to press this case – particularly considering the defendant is a major figure in Internet access and telecommunications services that is staffed with experts in all of these fields. Furthermore, this litigation has spanned state court, federal court, the Kentucky Department of Revenue and the Board of Tax Appeals. In finding that the attorneys in *Corel* had demonstrated "skill and efficiency," the court noted the attorneys' "considerable experience" with the legal issues in question and that they had faced "formidable legal opposition." *Corel,* 293 F.Supp.2d at 496. The same is true here. These factors must be heavily weighed in determining the reasonableness of the fee request. Policy dictates that Plaintiffs' attorneys should be rewarded, not penalized, for having achieved an advantageous settlement for the classes without a protracted trial.

Finally, Plaintiffs' attorneys bore the risk of nonpayment. When Plaintiffs brought this suit they were confronted with the unyielding opposition not only of BellSouth, but of the Kentucky Department of Revenue. Plaintiffs' attorneys' fee request is reasonable, and should be granted.

**CONCLUSION**

The facts, the law and the equities conclusively establish that Plaintiffs are entitled to attorneys' fees from the common fund created as a result of their efforts in this case and for reimbursement of costs expended in pursuing it. An award of thirty-three

percent of the common fund so established is reasonable as it is an approximation of the market rate in contingency cases. The reasonableness of this fee is further underscored by the difficulties and risks in this case, the number of class members benefited, the size of the fund and the result achieved. The Defendant is returning all of the millions wrongly collected, together with interest. For these reasons, Plaintiffs respectfully request that their motion for attorneys' fees and for reimbursement of costs be granted.

Respectfully submitted,

/s/ D. Randall Gibson
D. Randall Gibson
John W. Bilby
Douglas F. Brent
Deborah T. Eversole
STOLL KEENON OGDEN PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202
Telephone: (502) 333-6000
Counsel for Plaintiffs